**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NORTH DAKOTA
FARGO DIVISION**

| | |
|---|---|
| In re: | ) |
| | ) Case No. 25-30429 |
| MonDak Portables, LLC, | ) |
| | ) |
| Debtor. | ) Chapter 11 |
| | ) |
| | ) |
| | ) |

**DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF
<u>REORGANIZATION DATED APRIL 6, 2026</u>**

Submitted by Plan Proponents
(As set forth on Page 2 herein)

## PLAN PROPONENTS

**Debtor and Debtor in Possession,
By and through counsel:**

| | |
|---|---|
| THE DAKOTA BANKRUPTCY FIRM | CAROTHERS & HAUSWIRTH LLP |
| Maurice B. VerStandig | Patrick W. Carothers (PA ID No. 85721) |
| Christianna A. Cathcart | Gregory W. Hauswirth (PA ID No. 307482) |
| 1630 1st Avenue N | Foster Plaza 10 |
| Suite B PMB 24 | 680 Andersen Drive, Suite 230 |
| Fargo, North Dakota 58102-4246 | Pittsburgh, PA 15220 |
| Phone: (701) 394-3215 | Telephone: 412-910-7500 |
| mac@dakotabankruptcy.com | Facsimile: 412-910-7510 |
| christianna@dakotabankruptcy.com | pcarothers@ch-legal.com |
| | ghauswirth@ch-legal.com |

**Equity Holders in Reorganized Debtor and Key yees:**

Equity Holders:

Katherine Zent
Barbara Rogers
Linda Byerly

Key Employees:

Katherine Zent
Barbara Rogers
Rick Rogers

---

## TABLE OF CONTENTS

ARTICLE I: INTRODUCTION ....................................................................................... 5

1.1.    Preliminary Statement ................................................................................................ 5

1.2.    Overview of Chapter 11 ............................................................................................. 6

1.3.    Summary of the Plan. ................................................................................................. 7

1.4.    Rules of Construction. ............................................................................................... 8

ARTICLE II: BACKGROUND REGARDING DEBTOR ........................................ 8

2.1    History of MonDak and Circumstances Leading to Chapter 11 Filing ...................... 8

2.2    Employees .................................................................................................................... 12

2.3    Assets of Debtor. ........................................................................................................ 13

ARTICLE III: DESCRIPTION OF THE PLAN ........................................................ 14

3.1    Classification and Treatment of Claims and Equity Interests. ................................ 14

3.2    Equity Holders of Reorganized Debtor. ................................................................... 26

3.3    Claims Bar Date and Procedures for Treating Disputed Claims. .............................. 26

3.4    Modification or Revocation of the Plan; Severability; Cramdown. .......................... 27

3.5    Who May Vote. ............................................................................................................ 27

3.6    Vote Required for Acceptance by a Class. ................................................................ 27

3.7    Voting Procedures. ..................................................................................................... 28

3.8    Confirmation Hearing. ............................................................................................... 28

ARTICLE IV: CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE .................... 28

4.1    Conditions to Effective Date. .................................................................................... 28

4.2    Waiver of Conditions. ................................................................................................. 29

4.3    Effect of Non-Occurrence of the Effective Date. ..................................................... 29

ARTICLE V: FACTORS AFFECTING REORGANIZED DEBTOR'S ABILITY TO
PERFORM UNDER THE PLAN ..................................................................................... 29

5.1      MonDak's Historical Performance. ................................................................................ 29

5.2      Ability to Make Future Payments Under Plan and Operate without Further Reorganization. .......... 30

5.3      Unforeseen Contingencies. .................................................................................. 30

5.4      Projections are not Guaranteed. ............................................................................ 30

**ARTICLE VI: ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF**

**THE PLAN**....................................................................................................**30**

6.1      Liquidation Under Chapter 7. ............................................................................... 30

6.2      Alternative Plan of Reorganization ........................................................................ 31

**ARTICLE VII: LEGAL EFFECTS OF THE PLAN** ...............................................**31**

7.1       Vesting of Assets. ........................................................................................ 31

7.2       Binding Effect. .......................................................................................... 31

7.3       Discharge of Debtor. ..................................................................................... 32

7.4       Injunctions. ............................................................................................. 32

7.5       Preservation of Rights. .................................................................................. 33

7.6       Releases. ................................................................................................ 34

7.7       Federal Tax Consequences. ................................................................................ 34

**ARTICLE VIII: RECOMMENDATIONS AND CONCLUSION** ..........................................**35**

<u>**EXHIBITS:**</u>

☐ <u>Exhibit A</u> - Plan

☐ <u>Exhibit B</u> – Historical Pre-Petition Performance

☐ <u>Exhibit C</u> – Projections

☐ <u>Exhibit D</u> – Liquidation Analysis

DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION
DATED APRIL 6, 2026

**DISCLOSURE STATEMENT FOR THE CHAPTER 11 PLAN OF REORGANIZATION
DATED APRIL 6, 2026**

**ARTICLE I: INTRODUCTION**

This Disclosure Statement for the Chapter 11 Plan of Reorganization, dated April 6, 2026, describes the terms and provisions of the Chapter 11 Plan of Reorganization, dated April 6, 2026 filed in this Chapter 11 Case before the United States Bankruptcy Court for the District of North Dakota by: (1) MonDak Portables, LLC; (2) Katherine Zent, Barbara Rogers and Linda Byerly, who collectively hold the Equity Interests in Debtor; and (3) Katherine Zent, Barbara Rogers and Rick Rogers, who are the Key Employees of MonDak.  MonDak, Katherine Zent, Barbara Rogers, Rick Rogers and Linda Byerly shall be collectively referred to herein as the "Plan Proponents."

The purpose of this Disclosure Statement is to provide "adequate information," as that term is defined in Section 1125 of the Bankruptcy Code, to enable creditors of MonDak, whose Claims or Equity Interests are Impaired under the Plan and whose votes are being solicited, to make an informed decision whether to vote in favor, or to vote against the Plan. **A copy of the Plan is attached to this Disclosure Statement as Exhibit A.**

In case of any discrepancy between this Disclosure Statement and the Plan, the provisions of the Plan shall control. **Capitalized terms used in this Disclosure Statement but not defined herein shall have the meanings ascribed to them in the Plan.**

The Bankruptcy Court has approved this Disclosure Statement after notice and a hearing.  The Bankruptcy Court found that the information contained herein meets the standards set forth in Section 1125 of the Bankruptcy Code.  The Bankruptcy Court, however, has not passed upon the Plan, and therefore, this Disclosure Statement and the Order approving it should not be construed as an approval of the Plan by the Bankruptcy Court.

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN COMPILED BY PLAN PROPONENTS AND MONDAK'S BANKRUPTCY ESTATE PERSONNEL AND HAS NOT BEEN SUBJECT TO AN INDEPENDENT AUDIT OR REVIEW.  NO REPRESENTATION CONCERNING MONDAK IS AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.**

    1.1.    Preliminary Statement

Through this Chapter 11 Case, MonDak is attempting to stabilize its overall business operations and utilize its revenue sources to pay its ordinary course of business debts.

By way of background, MonDak is a female-owned and operated enterprise. Specifically, Katherine Zent, Barbara Roger and Linda Byerly, own all of the Equity Interests in MonDak (45%, 45% and 10% respectively). MonDak obtained its Women-Owned Small Businesses (WOSB) and Economically Disadvantaged Women-Owned Small Businesses (EDWOSB) certifications from the U.S. Small

Business Administration in 2016.  MonDak is in the portable toilet and sanitation business, providing units to companies and entities that need them for their personnel and the general public. MonDak employs a total of 15 employees across its facilities. MonDak projects its next 12 months of revenue to be approximately $3.5 million dollars with steady year-over-year growth thereafter.

While MonDak can pay the debts it incurs in the ordinary course of its business, it has been plagued with historical debt service that accumulated through the twists and turns of a 10-year period that threaten the realities of its present-day restructured operations.  Therefore, through this Chapter 11 Case and the Plan, MonDak and the remainder of the Plan Proponents are proposing a mechanism to move forward while bringing finality to MonDak's longstanding debt service issues.

By way of background and as further set forth in greater detail in Article II of this Disclosure Statement, a slowdown in revenue for MonDak began in 2015 through an amalgamation of issues, including a substantial drop in demand from the oilfield industry, which MonDak attributed to Green New Deal (GND) initiatives and rising interest rates.  While MonDak worked through its setbacks and successes over the next decade (including the COVID-19 years), MonDak's viability was ultimately threatened by the extent of its historical debt. As creditors demands increased, such legal challenges proved costly to defend, posed potential liabilities, and consumed significant time and resources, especially of the Key Employees.  Eventually, it became clear that only a Chapter 11 bankruptcy proceeding could provide MonDak with the relief it required.

The reasoning is rather clear: MonDak cannot absorb all of its historical debt.  In fact, MonDak can only continue if it (a) restructures its senior secured debt owed to NAC; (b) restructures and/or recharacterizes debt owed to its remaining Allowed Secured Claims; (c) gains relief from unsecured debt incurred over time; and (d) continues to maintain the Key Employees.  If the Plan is not confirmed, MonDak will not be able to survive.  In this scenario, creditors at large would realize significantly less than the amounts promised to be paid to under the Plan.  Under the Plan, MonDak's business can continue and it can: (i) support payments to Holders of Allowed Secured Claims; (ii) satisfy payments on Priority Tax Claims; (iii) meet the operating expenses of the business; and (iv) pay Holders of Allowed General Unsecured Claims pursuant to the proposed treatment under the Plan an amount greater than Holders of Allowed General Unsecured Claims would receive in a liquidation.

### 1.2.    Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Pursuant to Chapter 11 of the Bankruptcy Code, a debtor may reorganize for its benefit and the benefit of its creditors and interest holders.  In Chapter 11 cases, a debtor typically remains in control of the estate as a "debtor-in-possession."  Upon filing a petition for Chapter 11 relief and during the pendency of a case, the Bankruptcy Code imposes an automatic stay against creditors' attempts to collect or enforce Claims against the debtor, through litigation or otherwise.  The automatic stay provisions of Section 362 of the Bankruptcy Code, unless modified by court order, will generally prohibit or restrict attempts by creditors to collect or enforce any Claims against the debtor that arose prior to the commencement of the Chapter 11 case.

A Chapter 11 plan is the vehicle for implementing the reorganization and satisfying or otherwise addressing the Claims against and interests in a debtor.  After the Chapter 11 plan has been filed, the Holders of Claims against and interests in a debtor, whose Claims or interests are Impaired under the plan, may vote to accept or reject the plan.  Section 1125 of the Bankruptcy Code requires that before soliciting acceptances of the proposed plan, a debtor must prepare a disclosure statement containing "adequate information."  This information must be in such detail as to enable a hypothetical reasonable investor to make an informed decision about the Plan.  In this Chapter 11 Case, Classes of Claims or Equity Interests are Impaired under the Plan, and therefore, such Classes are entitled to vote to accept or reject the Plan.

      1.3.     <u>Summary of the Plan</u>.

The Plan is the result of commitments made by the Key Employees and Plan Proponents and contains the following key economic terms, features and mechanics: [1]

1. Following the Effective Date, the Key Employees will continue to operate MonDak.  For the duration of the Plan, the Key Employees have agreed to maintain the level of compensation that they received as of the Petition Date;

2. Distributions under the Plan shall be made through (a) cash on hand as of the Plan's Effective Date; (b) cash generated by MonDak's business operations over the term of the Plan; and (c) the New Value Contribution;

3. Allowed Administrative Expense Claims, fees of the United States Trustee, Priority Tax Claims and Priority Non-Tax Claims shall be paid in full;

4. Claims of Secured Creditors shall be restructured and/or bifurcated into Allowed Secured Claims and General Unsecured Claims, based upon the value of each Secured Creditor's Collateral;

5. Except to the extent specifically rejected or modified through this Chapter 11 Case or the Plan, all Allowed General Unsecured Claims shall receive a Pro-Rata share of Distributions of a pool of funds in accordance with Section 4.10 of the Plan; and

6. In exchange for the New Value Contribution, Katherine Zent, Barbara Rogers and Linda Byerly shall retain the Equity Interests in MonDak in accordance with Section 4.11 of the Plan.

---

[1] Any summaries or descriptions of the Plan in this Disclosure Statement are qualified in their entirety by references to the provisions of the Plan.  See <u>Exhibit A</u> attached hereto.

A table outlining the classification, treatment, and estimated percentage recoveries for Holders of Claims (those holding unclassified Claims and those holding classified Claims) and Equity Interests under the Plan are set forth in Article III of this Disclosure Statement.

### 1.4.    Rules of Construction.

For purposes of the Plan: (i) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit as it may have been or may be amended, modified or supplemented; (ii) unless otherwise specified, all references in the Plan to Sections, Articles, and Exhibits are references to Sections, Articles, and Exhibits of or to the Plan; and (iii) the rules of construction set forth in Section 102 of the Bankruptcy Code and the Bankruptcy Rules shall apply unless superseded in the Plan or in the Confirmation Order.

## ARTICLE II: BACKGROUND REGARDING DEBTOR

### 2.1    History of MonDak and Circumstances Leading to Chapter 11 Filing

As noted above, MonDak is in the portable toilet and sanitation business, providing units to companies and entities that need them for their personnel and the general public.  MonDak operates two complementary lines of business, being the "Rental Business" and the "Manufacturing Business":

a) Rental Business. MonDak's original line of business is a portable latrine rental and service operation.  The division services North Dakota, Montana, Indiana, Wyoming, Nebraska, and Colorado (the "Rental Business"). Through the Rental Business, MonDak rents out standard portables, trailer portables, handwash stations, and latrines for handicapped use to federal agencies, residential, commercial, oilfield, and special event clients. In addition, this operation delivers potable water and performs septic pumping services for residential, business, and oilfield customers.  MonDak operates this business and houses the majority of the rental units not located at a customer's facility at its facilities in Epping, North Dakota.

b) Manufacturing Business. The second line of business was established in 2014 and is a custom trailer manufacturing operation that builds units for disaster relief companies, the film and television industry, and portable latrine companies. The types of trailers manufactured include restroom trailers, shower trailers, laundry trailers, office trailers, talent trailers, honeywagon trailers, and disaster relief trailers (the "Manufacturing Business"), which MonDak produces at its manufacturing facility in Fairmount, Indiana.

The Rental Business commenced operation in September 2008 when MonDak acquired substantially all of the assets of a similar going concern, Corey's Portables (a highly respected provider of the same rental services, which had serviced the area since 1989). At the time of the

acquisition, Corey's Portables had revenues of approximately $500,000, focusing primarily on the rental market. As part of the acquisition, MonDak acquired approximately 200 portable toilets.

Over the next several years, MonDak realized steady growth both in terms of revenue and asset acquisition. By the end of 2011, revenue had increased to $3.2 million and portable latrine inventory increased to 1,250.  Going into 2012, given its steady growth, MonDak constructed a 14,500 square foot facility on 10 acres to support its Rental Business, at 13008 60th St. NW, Epping, North Dakota. The Epping Facility continues to serve as the company's headquarters today.

In 2013, MonDak began its Manufacturing Business, initially to manufacture specialty trailers for its own use in the Rental Business. MonDak elected to locate the Manufacturing Business in the State of Indiana due to geographically available labor and sourcing synergies. Given these advantages, MonDak made an investment to acquire an industrial property that consists of 13,000 square feet, located at 625 East Sixth Street, Fairmount, Indiana. MonDak is able to source almost all of its supplies necessary to manufacture its products within 4 hours of the Fairmount Facility.

Between 2013 and 2014, MonDak's overall revenue exceeded $6.0 million per annum and climbed to a high of $6.6 million in 2014.  However, in 2015, and through the 2016 federal election cycle, a slowdown began through an amalgamation of issues, including a substantial drop in demand from the oilfield industry, which MonDak attributed to Green New Deal (GND) initiatives and rising interest rates. MonDak felt the effect of such issues and concerns, and annual revenue fell to $5.6 million in 2015. The slide continued into 2016 in a monumental way, as the annual revenues for that year fell to $2.6 million.

Between 2017 and 2018, attempting to reinvent itself, MonDak began to bid on governmental work and was awarded an opportunity to provide and service 150 handicap toilets to F.E. Warren Air Force Base. MonDak also added Linda Byerly as an additional member of its ownership team during that timeframe, who contributed much-needed working capital to MonDak. Notably, substantial expense adjustments were made as well.  By the end of 2018, such efforts boosted annual revenue for 2018 to $3.4 million, and MonDak realized a modest profit on the lower revenues.

The uptick not only built momentum for MonDak, but it also allowed MonDak to make an application for a long-needed working capital loan. On November 29, 2018, MonDak obtained a loan from North Avenue Capital, LLC ("NAC"). Specifically, MonDak, as borrower, executed and delivered to NAC, as lender, that certain Loan Agreement in the original principal sum of $3,115,000 ("NAC Loan x0718"). The NAC Loan x0718 was backed by a federal loan guarantee through the United States Department of Agriculture. To secure NAC Loan x0718, MonDak granted security interests in all of MonDak's assets, including but not limited to its inventory, accounts, equipment, fleet of vehicles, and liens on real property (collectively, the "NAC Collateral"). The NAC Collateral includes an inventory of no less than 2,000 portables, trailer portables, handwash stations, and toilets for handicapped use, together with MonDak's fleet of

trucks and equipment to transport, service, and maintain such inventory, as well as MonDak's real property, being the Epping Facility and the Fairmount Facility. NAC perfected its security interests in the NAC Collateral by filing UCC-1 Financing Statement No. 18-000472010-1 with the Secretary of State of North Dakota on December 3, 2018. NAC subsequently filed a UCC-1 continuation statement with the Secretary of State of North Dakota on October 31, 2023. NAC also recorded mortgages against the Epping Facility in Williams County, North Dakota and the Fairmount Facility in Grant County, Indiana. Pursuant to the terms of NAC Loan x0718, MonDak owed a monthly payment of $34,843 to NAC.

After a few years of relative prosperity, in 2020, the impact of the COVID-19 pandemic resulted in another substantial downturn of revenue. MonDak finished the year with only $2.3 million dollars realized. As a direct result, MonDak sought and obtained an additional loan from NAC. Specifically, On October 26, 2020, MonDak, as borrower, executed and delivered to NAC, as lender, that certain Loan Agreement in the original principal amount of $565,000 ("NAC Loan x2754"). The NAC Loan x2754 is also backed by a federal loan guarantee through the United States Department of Agriculture. To secure NAC Loan x2754, MonDak granted additional security interests and liens in the NAC Collateral. NAC perfected its security interests in the NAC Collateral for NAC Loan x2754 by filing UCC-1 Financing Statement No. 20-000797803-1 with the Secretary of State of North Dakota on October 28, 2020, and by recording an additional mortgage against the Epping Facility in Williams County, North Dakota on November 5, 2020. Pursuant to the terms of NAC Loan x2754, MonDak owed a monthly payment of $7,311 to NAC (when combined with the monthly payment due under NAC Loan x0718, MonDak had a monthly debt service payment due to NAC totaling $42,154 (the "NAC Debt Service").

As the effect of COVID-19 continued into 2021, MonDak continued to struggle and its ability to preserve capital was strained.  In order to sustain its operations, MonDak needed another working capital loan.   MonDak was able to obtain such funding from the U.S. Small Business Administration through its economic injury disaster loan program in the original principal sum of $1,500,000 (the "EIDL Loan"). MonDak entered into the EIDL Loan on September 24, 2021.  The EIDL Loan was secured by all assets of MonDak except for its fleet of vehicles and interests in real property. The USSBA perfected its security interest in such collateral by filing UCC-1 Financing Statement No. 21-000956808-5 with the North Dakota Secretary of State on October 7, 2021. Pursuant to the terms of the EIDL Loan, MonDak owed a monthly payment of $7,716 to the USSBA (the "USSBA Debt Service").

Notwithstanding these capital infusions, as the impact of the COVID-19 pandemic continued, revenue continued to slide. MonDak finished 2021 with $1.4 million in revenue. While dire, MonDak did not give up – and sought ways to rebuild its business.  Endeavoring to build on its services available to its existing customer base, MonDak acquired the assets of a potable water company (T&T Enterprises) for $350,000 to expand its service offering within the Rental Business.

The expansion did not result in immediate financial impact and MonDak's revenue levels generally did not recover.  This led MonDak to take out more loans to cover operating expenses.  Given its

overall financial condition, this time the new loans proved to be expensive. Specifically, MonDak was forced to seek loans from "merchant lenders." Merchant lenders are unregulated lenders owned by private equity groups who advance funds to small businesses at extremely high interest rates and on very short aggressive repayment terms. Repayment of "merchant loans" is typically required to be made through daily/weekly debits from the borrower's operating accounts in disregard to other cash needs of the borrower. MonDak procured loans from merchant lenders (the "Merchant Lenders") on the following terms (being the "Merchant Lender Debt Service"):

| UCC Filing Date | Lender | Loaned Amount | Loaned Funds After Fees | Amount of Payment(s) owed to each week |
|---|---|---|---|---|
| 06/28/2022 | Kapitus LLC | $204,000 | $150,000 | $3,750* |
| N/A | Cloudfund LLC | $278,000 | $200,000 | $5,782 |
| * | Kapitus LLC | $251,600 | $185,000 | $3,874 |

*The balance of the first loan from Kapitus, LLC was refinanced through the issuance of the second loan from Kapitus, LLC.

In 2022 MonDak further expanded service/product offering by manufacturing custom trailers available for purchase, with a focus on the disaster relief market, the film and television market, as well as offering manufacturing to other portable latrine companies. Specifically, this included trailers specializing in handling basic needs beyond latrine use (i.e., trailers equipped for laundry, kitchens, and showers). MonDak also expanded its Rental Business through the acquisition of the assets of a competitor (Byers), which enabled MonDak to acquire additional customers along existing customer routes of its Rental Business.  In connection with such acquisition, MonDak owed a monthly payment of $6,581 to Byers over a term of 24 months (the "Byers Debt Service").

MonDak's strategies in 2022 to expand its operations and service/product offerings enabled MonDak to rebound from its COVID-19 pandemic era, and revenue eventually leveled in 2022 to $3.9 million (60% from the Rental Business and 40% from the Manufacturing Business) and $3.8 million in 2023 (75% from the Rental Business and 25% from the Manufacturing Business).

Unfortunately, MonDak's overall debt service remained substantial.  During that time, the United States Internal Revenue Service (the "IRS") also filed a Notice of Federal Tax Lien (the "Federal Tax Lien", in the amount of $198,718), stemming from outstanding payroll tax liabilities (Section 941) incurred in 2017-2018. While MonDak was able to substantially pay down its tax liabilities in time, statutory penalties and interest remained outstanding and the albatross of MonDak's overall debt service continued.

Given the foregoing history and MonDak's stalled recovery since the COVID-19 pandemic, in early 2024, MonDak hired Second Wind Consulting to pursue options for a sale of the company.

DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION
DATED APRIL 6, 2026

While MonDak vetted potential suitors, MonDak and its professionals were unable to identify a viable buyer. Absent a viable buyer, MonDak pivoted to renewing its focus on restructuring its operations to continue to operate as a going concern.

In the winter of 2024 MonDak engaged professionals through International Development Services, Inc. ("IDS") to assist in optimizing the size of its operations, improve its cash flow and find out of court solutions with its creditor body at large. Over time, IDS assisted MonDak in streamlining its operations, updating its pricing and bidding strategies, improving its cashflow and its overall focus on a go-forward basis.

However, as MonDak found its proverbial footing operationally with the help of IDS, MonDak still needed to reach solutions with its creditor body. As the value of MonDak's assets do not exceed the balances owed to NAC alone, the simple reality is that MonDak is unable to service all of its debt at its current levels (which included at a minimum, the NAC Debt Service, the USSBA Debt Service, the Federal Tax Lien, the Merchant Lender Debt Service, and the Byers Debt Service).

Given such realities, together with the acceleration of creditor demands on MonDak's outstanding debt service and the ensuing litigation to collect the same (including but not limited to litigation commenced by NAC, Merchant Lenders, CapFirst and FFBT), MonDak commenced this Chapter 11 Proceeding and together with the Plan Proponents submits the Plan, which it believes is feasible and confirmable.

### 2.2    Employees.

Generally, as of the Petition Date, MonDak employed fifteen (15) full-time employees in the greater Epping, North Dakota and Fairmont, Indiana communities. The most vital employees to the business operations are the Key Employees. Information about the Key Employees is contained below:

1) **Katherine Zent.** Katherine Zent is President of MonDak and oversees all operational, financial, and human resource matters of MonDak, as well as MonDak's sales and marketing efforts. Her responsibilities include developing and implementing the company's mission, vision, and strategic plans to promote revenue growth, profitability, and organizational development. Katherine Zent's key duties include: (i) management of daily operations across all departments; (ii) allocation of materials, human resources, and financial resources to efficiently operate the company; (iii) cultivating relationships with clients, partners, and stakeholders as well as generating new business with potential clients. Katherine Zent's current annual salary with MonDak is $64,000.

2) **Barbara Rogers.** Barbara Rogers is the Chief Financial Officer of MonDak and oversees all aspects of the financials of the business. This includes the following: (i) implementation of financial strategies to support long-term growth; (ii) implementation of controls and

procedures for financial aspect of the business; (iii) analysis and preparation of financial reports to present to the President and third-party advisors; (iv) managing and preparing budgets, forecasting, financial planning, and cash flow management; and (v) administering accounts payable and accounts receivable.  Babara Roger's current annual salary with MonDak is $85,000.

3) **Rick Rogers.** Rick Rogers is the General Manager of MonDak and is responsible for overseeing all aspects of operations. His key duties include: (i) managing operations, including managing employees, coordinating drivers and customer routes, enforcement of proper safety practices within the Rental Business and the Manufacturing Busines; and (ii) cultivating relationships with clients, partners, and stakeholders as well as generating new business with potential clients.   Rick Roger's current annual salary with MonDak is $125,000.

Under the Plan and for the duration of the Plan, such individuals will remain as employees of MonDak and will continue to be compensated at the same rates of pay as listed above for the duration of the Plan.

2.3      Assets of Debtor.

As of the Petition Date, the assets of Debtor consist of the following assets.  As MonDak is operating as an ongoing business concern, it is anticipated that some fluctuation will occur as various receivables are collected, and new receivables are generated.

a.  **Assets**

| Description | Value (as of Petition Date) |
| --- | --- |
| Cash | $93,921 |
| Accounts Receivable | $247,535 |
| Inventory | $53,637 |
| Machinery, Fixtures, and Equipment | $1,705,000 |
| Real Property [Epping Facility] | $1,370,000 |
| Real Property [Fairmont Facility] | $360,000 |
| **Total** | **$3,830,093** |

A more detailed/itemized description of the assets of MonDak is set forth in Debtor's Schedules filed in this Chapter 11 Case (Docket No. 51) and is outlined in Debtor's "Liquidation Analysis" (as defined and outlined in Section 6.1 herein).

## ARTICLE III: DESCRIPTION OF THE PLAN

3.1     Classification and Treatment of Claims and Equity Interests.

The Plan sets forth the Claims and Equity Interests of MonDak and divides them into 12 Classes. The classification and treatment of the Claims and Equity Interests are summarized below. The summaries provided below are qualified in their entirety by reference to the provisions in the Plan:

| CLASS | DESCRIPTION AND TREAMENT |
|---|---|
| Administrative Expense Claims<br><br>**(Unclassified)** | As set forth in Section 2 of the Plan, each Holder of an Administrative Expense Claim shall be paid one hundred percent (100%) of its Allowed Claim in cash on the Effective Date, except to the extent that such Holder agrees to different treatment.<br><br>Notwithstanding the immediately preceding sentence: (a) Administrative Expense Claims incurred in the ordinary course of business and on ordinary business terms shall be paid by Reorganized Debtor in accordance with |
|  | ordinary business terms for payment of such Claims; and (b) Administrative Expense Claims of the United States Trustee for fees pursuant to Section 1930(a)(b), Title 28, shall be paid by Reorganized Debtor in accordance with the applicable schedule for payment of such fees until a final decree is entered and the case is closed.<br><br>Notwithstanding the foregoing, the Holder of an Administrative Expense Claim may receive such other treatment as may be agreed upon by the Holder and Reorganized Debtor.<br><br>The known Administrative Expense Claims of Debtor will consist of (a) the legal fees and expenses of Carothers & Hauswirth LLP ("C&H"); (b) professional fees and expenses of Ascend Business Services, LLC ("Ascend"); and (c) any fees of the United States Trustee. Payment of the fees and expenses of Debtor's foregoing professionals is subject to the prior approval of the Bankruptcy Court. |

| | |
|---|---|
| Priority Tax Claims<br><br>**(Unclassified)** | As set forth in Section 2 of the Plan, following the Effective Date, except to the extent that a Holder of an Allowed Priority Tax Claim agrees to different treatment, each Holder of an Allowed Priority Tax Claim may receive deferred monthly payments over a period not exceeding five (5) years from the order for relief entered in this bankruptcy proceeding (September 29, 2025) in accordance with Section 1129(a)(9) of the Bankruptcy Code.<br><br>Based upon the books and records of Debtor and Proofs of Claim that have now been filed in the case, Debtor asserts that the aggregate amount of Priority Tax Claims consists of 1,280.10 owed to the IRS. |
| CLASS 1<br><br>Priority Non-Tax Claims<br><br>**(Not Impaired)** | As set forth in Section 4.1 of the Plan, on the Effective Date, except to the extent that a Holder of an Allowed Priority Non-Tax Claim agrees to different treatment, each Holder of an Allowed Priority Non-Tax Claim shall receive either: (i) cash in an amount equal to one hundred percent (100%) of the unpaid amount of their respective  Allowed Priority NonTax Claim; or (ii) such other treatment, as determined by the Bankruptcy Code, required to render such Claim not Impaired.<br><br>Based upon the books and records of Debtor and Proofs of Claim that have now been filed in the case, Debtor assert that the aggregate amount of Priority Non-Tax Claims consists of $0.00.<br><br>Class 1 is not Impaired and is deemed to have accepted the Plan. |

| CLASS 2<br><br>NAC Secured Claim<br><br>**(Impaired)** | **Impairment and Voting**.<br><br>Class 2 is Impaired under the Plan.  The Holder of the Class 2 Claim is entitled to vote and accept or reject the Plan.<br><br>**Background**.<br><br>As previously set forth in detail in Section 2.1 above, MonDak and NAC are parties to NAC Loan x0718 and NAC Loan x2754 (collectively, the "NAC Secured Claim") and the NAC Secured Claim is secured by firstpriority Liens in the NAC Collateral.  NAC filed two Proofs of Claim for the NAC Secured Claim in this Chapter 11 Case, asserting an overall outstanding balance of $3,906,891.66 at Claim Nos. 4-1 and 5-1.<br><br>**Treatment**.<br><br>As set forth in Section 4.2 of the Plan, the NAC Secured Claim shall restructured and paid, net of any payments made to NAC following the Petition Date, through the following means:<br><br>i)    The NAC Secured Claim shall be deemed an Allowed Secured Claim equal to the $3,906,891.66 asserted in Proof of Claim No. 4-1 and 51; and<br><br>ii)   MonDak shall pay the NAC Secured Claim through monthly installments amortized over 240 months at the Prime Rate plus two (2.0) percent per annum (currently 8.75% in total), with such interest commencing on the Effective Date. Notwithstanding the foregoing amortization schedule, the entire principal balance, together with accrued but unpaid interest, shall be due in and payable in full 84 months following the Effective Date. As of the Effective Date, the initial monthly installments Reorganized Debtor will remit to NAC on the NAC Secured Claim will be $34,525.62. There shall be no prepayment penalty for an early payment of the obligations.<br><br>Payments on the NAC Secured Claim shall commence on the fifteenth day of the month following the Effective Date and shall be payable on the fifteenth day of each subsequent month thereafter.<br><br>As of the Effective Date, the NAC Secured Claim will be secured by (and exclusively by) Liens in the NAC Collateral and in all after-acquired assets of MonDak and Reorganized Debtor.  NAC shall be permitted to take all steps reasonably necessary to protect its Liens, including filing a UCC-1 Financing Statement.  Reorganized Debtor will execute any document or consent to any filing deemed necessary by NAC to protect its interests. |
| --- | --- |

| | |
|---|---|
| CLASS 3<br><br>USSBA Secured Claim<br><br>**(Impaired)** | **Impairment and Voting**.<br><br>Class 3 is Impaired under the Plan.  The Holder of the Class 3 Claim is entitled to vote and accept or reject the Plan.<br><br>**Background**.<br><br>As previously set forth in detail in Section 2.1 above, MonDak acquired the EIDL Loan from the USSBA pursuant to its economic injury disaster loan program in the fall of 2021 and was secured by a Lien in the USSBA Collateral.  The USSBA filed a Proof of Claim in this Chapter 11 Case at Claim No. 6-1, asserting an outstanding balance of $1,700,830.22 for the USSBA Secured Claim and acknowledging that the USSBA Secured Claim is actually a General Unsecured Claim.<br><br>**Treatment**.<br><br>The USSBA Collateral had no value as of the Petition Date beyond the value of other Liens of higher priority duly perfected on the same assets that comprise the USSBA Collateral (being the NAC Collateral). As a result, the USSBA Collateral cannot be liquidated for the benefit of the USSBA Secured Claim.<br><br>Therefore, as set forth in Section 4.3 of the Plan, following the Effective Date, the entirety of the USBBA Secured Claim shall be reclassified as a General Unsecured Claim in accordance with Section 506 of the Bankruptcy Code and subject to the procedures for treating Disputed Claims set forth in Section 8 of the Plan. |
| CLASS 4<br><br>Kapitus Secured Claim<br><br>**(Impaired)** | **Impairment and Voting**.<br><br>Class 4 is Impaired under the Plan and each Holder of a Class 4 Claim that is not Disputed is entitled to vote to accept or reject the Plan.<br><br>**Background**.<br><br>Commencing on June 23, 2022, and as refinanced on March 6, 2024, Kapitus advanced no less than $185,000 pursuant to a merchant cash advance lending agreement (the "<u>Kapitus Loan</u>") for access to working capital.  The Kapitus Loan was secured by a Lien in the Kapitus Collateral and evidenced by a duly perfected UCC-1 Financing Statement recorded |

| | |
|---|---|
| | with the Secretary of State for the State of North Dakota at Filing No. 22001077200-5 (on June 28, 2022). Kapitus filed a Proof of Claim in this Chapter 11 Case asserting an outstanding balance of $316,477.82 for the Kapitus Secured Claim at Claim No. 8-1.<br><br>**Treatment**.<br><br>The Kapitus Collateral had no value as of the Petition Date beyond the value of other Liens of higher priority duly perfected on the same assets that comprise the Kapitus Collateral (being, at a minimum, the NAC Collateral and the USSBA Collateral). As a result, the Kapitus Collateral cannot be liquidated for the benefit of the Kapitus Secured Claim.<br><br>Therefore, as set forth in Section 4.4 of the Plan, following the Effective Date, the entirety of the Kapitus Secured Claim shall be reclassified as a General Unsecured Claim in accordance with Section 506 of the Bankruptcy Code and subject to the procedures for treating Disputed Claims set forth in Section 8 of the Plan. |
| CLASS 5<br><br>IRS Secured Claim<br><br>**(Impaired)** | **Impairment and Voting**.<br><br>Class 5 is Impaired under the Plan and each Holder of a Class 5 Claim that is not Disputed is entitled to vote to accept or reject the Plan.<br><br>**Background**.<br><br>As previously set forth in detail in Section 2.1 above, in October 2022 the IRS recorded the Federal Tax Lien for outstanding income and payroll tax liabilities (Section 941), together with statutory penalties and interest for quarterly tax periods beginning in the first quarter of 2017 through the fourth quarter of 2018.  The Federal Tax Lien is further evidenced by the IRS's recording of a UCC-1 Financing Statement with the North Dakota Secretary of State on October 14, 2022 at Filing Nos. 22-001121016-2 and 22-001121032-2.  The Federal Tax Lien is a Lien against all assets of MonDak. The IRS filed a Proof of Claim in this Chapter 11 Case at Claim No. 1-1, asserting an outstanding balance of $51,258.08 for the IRS Secured Claim.<br><br>**Treatment**.<br><br>The IRS Collateral has no value as of the Petition Date beyond the value of other Liens of higher priority duly perfected on the same assets that comprise the IRS Collateral (being, at a minimum, the NAC Collateral, the |

| | |
|---|---|
| | USSBA Collateral and the Kapitus Collateral).  As a result, the IRS Collateral cannot be liquidated for the benefit of the IRS Secured Claim.<br><br>Therefore, as set forth in Section 4.5 of the Plan, following the Effective Date, the entirety of the IRS Secured Claim shall be reclassified as a General Unsecured Claim in accordance with Section 506 of the Bankruptcy Code and subject to the procedures for treating Disputed Claims set forth in Section 8 of the Plan. |
| CLASS 6<br><br>CapFirst Secured Claim<br><br>**(Impaired)** | **Impairment and Voting**.<br><br>Class 6 is Impaired under the Plan and each Holder of a Class 6 Claim that is not Disputed is entitled to vote to accept or reject the Plan.<br><br>**Background**.<br><br>On December 22, 2022, MonDak and CapFirst entered into that certain Equipment Finance Agreement in the original principal amount of $215,000.00 (the "CapFirst Equipment Loan").  To secure the CapFirst Equipment Loan, MonDak granted a security interest in (a) 3 titled vehicles and (b) in certain equipment and inventory acquired and financed pursuant to the CapFirst Equipment Loan (the "CapFirst Personal Property Collateral").  CapFirst's security interest in the CapFirst Personal Property Collateral was perfected by the recording of a UCC-1 Financing Statement with the North Dakota Secretary of State on December 16, 2022 at Filing No. 22-001142628-0.  Following a breach of the CapFirst Equipment Loan, MonDak surrendered the CapFirst Personal Property Collateral to CapFirst and CapFirst liquidated such Collateral prior to the Petition Date.<br><br>Prior to the Petition Date, CapFirst also commenced an action through the filing of a complaint in the District Court of the Northwest Judicial District, for Williams County and the State of North Dakota at Case No. 53-2024CV-01670 (the "CapFirst Action"), to recover the remaining  balance of its claims.  CapFirst's claims in the CapFirst Action were reduced to a judgment against MonDak in the amount of $101,366.46, which was recorded in Williams County, North Dakota on October 17, 2024. The recording of the CapFirst Judgement in Williams County also evidences a Lien against the Epping Facility in favor of CapFirst. CapFirst filed a Proof of Claim in this Chapter 11 Case at Claim No. 2-1, asserting an outstanding balance of $119,005.40 for the CapFirst Secured Claim. |

**Treatment**.

The CapFirst Secured Claim has no value as of the Petition Date beyond the value of other Liens of higher priority duly perfected on the same assets that are subject to the CapFirst Secured Claim (being at a minimum, the NAC Collateral and the IRS Collateral). As a result, there are no assets that can be liquidated for the benefit of the CapFirst Secured Claim.

Therefore, as set forth in Section 4.6 of the Plan, following the Effective Date, the entirety of the CapFirst Secured Claim shall be reclassified as a General Unsecured Claim in accordance with Section 506 of the Bankruptcy Code and subject to the procedures for treating Disputed Claims set forth in Section 8 of the Plan.

| CLASS 7 FFBT Secured Claim **(Impaired)** | **Impairment and Voting.**<br><br>Class 7 is Impaired under the Plan and each Holder of a Class 7 Claim that is not Disputed is entitled to vote to accept or reject the Plan.<br><br>**Background.**<br><br>Mondak was indebted to FFBT pursuant to the terms of (a) a Promissory Note dated March 27, 2015 in the original principal amount of $51,675.00; (b) a Promissory Note dated January 26, 2023 in the original principal amount of $205,446.00; and (c) a Promissory Note dated May 11, 2023 in the original principal amount of $75,000 (collectively, the "FFBT Loans"). To secure the FFBT Loans, MonDak granted (a) a mortgage in favor of FFBT against a property located at 802 N. Elm Street, Fairmont, Indiana (the "FFBT Mortgage"); and (b) a security interest in certain inventory and equipment pursuant to the terms of a Security Agreement dated January 26, 2023 (the "FFBT Personal Property Collateral"). FFBT perfected its security interest in the FFBT Mortgage by recording the FFBT Mortgage on March 27, 2015 in Grant County, Indiana. FFBT perfected its security interest in the FFBT Personal Property Collateral by recording a UCC-1 Financing Statement with the North Dakota Secretary of State on June 3, 2024 at Filing No. 24-001374354-3.<br><br>In June 2024, following a breach of the FFBT Loans, FFBT commenced an action through the filing of a complaint in the Circuit Court for Grant County, Indiana at Case No. 27CO1-2406-MF-000053 (the "FFBT Action"). The FFBT Action was unopposed and reduced to a judgment against MonDak in the amount of $212,205.14, which was recorded in Grant County, Indiana on August 16, 2024. |
|---|---|

MonDak's interest in the real property at 802 N. Elm Street, Fairmont, Indiana was surrendered and extinguished through a foreclosure sale held Grant County, Indiana in 2024 to partially satisfy the FFBT Judgment. The recording of the FFBT Judgment in Grant County, Indiana also secured a Lien against the Fairmont Facility. Finally, FFBT also recorded the FFBT Judgement as a foreign judgment in Williams County, North Dakota on September 26, 2024, securing a Lien against the Epping Facility.

As a result, as of the Petition Date, the recording of the FFBT Judgment in Grant County, Indiana and Williams County, North Dakota, together with the FFBT's perfected security interest against the FFBT Personal Property serve as the basis of FFBT's Secured Claim  (the "FFBT Secured Claim"). Based upon the books and records of Debtor, at this juncture the balance of the FFBT Secured Claim is unliquidated. FFBT did not file a Proof of Claim in this Chapter 11 Case.

**Treatment**.

The FFBT Secured Claim has no value as of the Petition Date beyond the value of other Liens of higher priority duly perfected on the same assets that are subject to the FFBT Secured Claim (being, at a minimum, the NAC Collateral, the USSBA Collateral and the Kapitus Collateral). As a result, there are no assets that can be liquidated for the benefit of the FFBT Secured Claim.

Therefore, as set forth in Section 4.7 of the Plan, following the Effective Date, Reorganized Debtor shall liquidate the value of the FFBT Secured Claim and the entirety of the FFBT Secured Claim shall be reclassified as a General Unsecured Claim in accordance with Section 506 of the Bankruptcy Code and subject to the procedures for treating Disputed Claims set forth in Section 8 of the Plan.

| | |
|---|---|
| CLASS 8<br><br>HYG Secured Claim<br><br>**(Impaired)** | **Impairment and Voting.**<br><br>Class 8 is Impaired under the Plan.  The Holder of the Class 8 Claim is entitled to vote and accept or reject the Plan.<br><br>**Background.**<br><br>In June 2022, and as amended in November 2023, HYG and MonDak entered into certain purchase money financing transactions which enabled MonDak to purchase the HYG Collateral (consisting of three used Genie lifts and one Yale lift) through installments agreements with monthly payments totaling $1,991.07 and $329.54, each over a term of 24 months, with the term of such financing agreements maturing on in June 2024 and November 2025 respectively.<br><br>The HYG Claim is secured by a first-priority Lien on the HYG Collateral.  HYG perfected its security interest in the HYG Collateral by recording a UCC-1 Financing Statement with the North Dakota Secretary of State on August 8, 2022 at Filing No. 22-001091914-1.  HYG filed a Proof of Claim in this Chapter 11 Case at Claim No. 3-1, asserting an outstanding balance of is $16,312.61.<br><br>**Treatment**.<br><br>As set forth in Section 4.8 of the Plan, the HYG Secured Claim shall be paid, through the following means:<br><br>Monthly installments amortized over 24 months at the Prime Rate plus two percent per annum (currently 8.75% in total), with such interest commencing on the Effective Date.  As of the Effective Date, the initial |

| | |
|---|---|
| CLASS 9<br><br>Ascentium<br>Secured Claim<br><br>**(Impaired)** | **Impairment and Voting**.<br><br>Class 9 is Impaired under the Plan. The Holder of the Class 9 Claim is entitled to vote and accept or reject the Plan.<br><br>**Background**.<br><br>On or about November 10, 2023, Ascentium and MonDak entered into a purchase money financing transaction whereby Ascentium loaned the principal amount of $41,832.25 to MonDak to enable Mondak to purchase the Ascentium Collateral (consisting of a 68 gallon tanks and side panels for handicap toilets), at an interest rate of 14% over a term of 36 months.<br><br>Payments on the Ascentium Secured Claim shall commence on the fifteenth day of the month following the Effective Date and shall be payable on the fifteenth day of each subsequent month thereafter.<br><br>The Ascentium Secured Claim is secured by a first-priority Lien on the Ascentium Collateral. Ascentium perfected its security interest in theAscentium Collateral by recording a UCC-1 Financing Statement with the North Dakota Secretary of State on November 10, 2023 at Filing No. 23001283268-3 .Ascentium filed a Proof of Claim in this Chapter 11 Case at Claim No. 7-1, asserted a total outstanding balance of $44,881.73, inclusive of a Secured Claim of $15,000 and a General Unsecured Claim of $29,881.73.<br><br>**Treatment**.<br><br>As set forth in Section 4.9 of the Plan, the Ascentium Secured Claim shall be deemed to be equal to the $15,000 asserted in Claim No. 7-1, net of any payments made following the Petition Date on account of the Ascentium Secured Claim, through the following means: |

| CLASS 10<br><br>General Unsecured Claims<br><br>**(Impaired)** | **Impairment and Voting**.<br><br>Class 10 is Impaired under the Plan and each Holder of a Class 10 Claim that is not Disputed is entitled to vote to accept or reject the Plan.<br><br>**Treatment**.<br><br>As set forth in Section 4.10 of the Plan, Holders of Allowed General Unsecured Claims shall receive a combination of the following under the Plan:<br><br>A Pro-Rata share of twelve (12) consecutive quarterly payments of $7,500.00 for total payments of $90,000.00. Such payments shall commence on the last Business Day of the 3rd full month after the Effective Date occurs and continue thereafter on the last Business Day of each quarter for eleven (11) consecutive quarters (i.e. if the Effective Date is May 10, 2026, the first payment will be due on the last Business Day of August 2026); |
| --- | --- |

| CLASS 11<br><br>Equity Interest<br><br>**(Not Impaired)** | **Impairment and Voting**.<br><br>Class 11 is not Impaired under the Plan and is not entitled to vote to accept or reject the Plan.<br><br>**Background.**<br><br>Katherine Zent, Barbara Rogers, and Linda Byerly own 100% of the Equity Interests in MonDak.<br><br>**Treatment.**<br><br>As set forth in Section 4.11 of the Plan, in exchange for the New Value Contribution (being the Equity Holders' Promissory Note), the Equity Interests of Katherine Zent, Barbara Rogers, and Linda Byerly in MonDak as Reorganized Debtor shall remain equal to the Equity Interests in MonDak held by Katherine Zent, Barbara Rogers, and Linda Byerly prior to the Petition Date. |

### 3.2     Equity Holders of Reorganized Debtor.

In exchange for the New Value Contribution, Katherine Zent, Barbara Rogers, and Linda Byerly shall maintain Equity Interests in Reorganized Debtor in the same percentages (45%, 45% and 10% respectively) they held in MonDak prior to the Petition Date.  Plan Proponents believe that Katherine Zent, Barbara Rogers, and Linda Byerly are the only potential Holders of Equity Interests in Reorganized Debtor, as they are the only parties who can lead and maintain MonDak's business and who can secure the services of the Key Employees.  If Katherine Zent, Barbara Rogers, and Linda Byerly are not the Holders of Equity Interests in Reorganized Debtor, the Key Employees would not work for Reorganized Debtor.  Given the level of critical importance that the Key Employees possess to the operation of Reorganized Debtor's business, it is impossible to fathom that any other third party would invest in Reorganized Debtor. It is further impossible to believe that Reorganized Debtor could obtain the results needed to perform the obligations under this Plan without the Key Employees. The New Value Contribution is provided as the principal amount found within the Promissory Note, Exhibit 1 of the Plan, as provided by the parties to the Reorganized Debtor.

### 3.3     Claims Bar Date and Procedures for Treating Disputed Claims.

The Bankruptcy Court established December 8, 2025, as the general bar date for filing Proof of Claims against Debtor (the "General Bar Date") at Docket No. 4 in this Chapter 11 Case. Governmental Units are required to file Proofs of Claim by March 30, 2026 (the "Governmental Bar Date").  Debtor or Reorganized Debtor shall be entitled to, and reserve the right to, object to their Claims. At this juncture, Reorganized Debtor does not anticipate objecting to any of the Proof of Claims filed as of the date hereof. Unless otherwise ordered by the Bankruptcy Court, Debtor

and/or Reorganized Debtor shall follow the procedures for treating Disputed Claims set forth in Section 8 of the Plan.

3.4     Modification or Revocation of the Plan; Severability; Cramdown.

Plan Proponents reserve the right to modify, alter, amend, revoke or withdraw the Plan at any time prior to the Confirmation Date in the manner provided by Section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure except as the Bankruptcy Court may otherwise order; provided, however, that Plan Proponents may make a material amendment to, or modification of, the Plan only with the approval of the requisite majorities specified in Section 1126 of the Bankruptcy Code. Plan Proponents do not anticipate that the Plan will be modified in such a way as to require additional balloting.

Plan Proponents reserve the right after the Confirmation Date and before the Effective Date to modify the terms of the Plan or waive any conditions to the effectiveness thereof that can be waived if, and to the extent that, Plan Proponents determine that such modifications or waivers are necessary or desirable in order to consummate the Plan.  Plan Proponents will give such Holders of Claims and Equity Interests notice of such modifications or waivers as may be required by applicable law and the Bankruptcy Court, and any such modifications will be subject to the approval of the Bankruptcy Court to the extent required by Section 1127 of the Bankruptcy Code.

If there is an Impaired Class of Claims or Equity Interests and such Class does not accept the Plan, Plan Proponents request a Confirmation Order under Section 1129(b) of the Bankruptcy Code. Plan Proponents reserve the right to modify the Plan to the extent, if any, that confirmation pursuant to Section 1129(b) of the Bankruptcy Code requires modification or for any other reason in their discretion.

3.5     Who May Vote.

Only Holders of Claims and Equity Interests Allowed under Section 502 of the Bankruptcy Code may accept or reject a plan.  Holders of Allowed Claims that are Impaired and that receive or retain property under a reorganization plan are entitled to vote to accept or reject the Plan.  A Claim or Equity Interest is Impaired if the Plan modifies (other than by curing defaults or reinstating the maturity date) the legal, equitable, or contractual rights to which the Holder of a Claim or Equity Interest of that Class is entitled.  Classes of Claims and Equity Interests that are not Impaired are conclusively presumed to have accepted the Plan and thus are not entitled to vote on the Plan. Classes of Claims and Equity Interests whose Holders receive or retain no property under the Plan are deemed to have rejected the Plan and are not entitled to vote on the Plan.

Class Nos. 2-11 are Impaired under the Plan; therefore, such Classes are entitled to vote to accept or reject the Plan.  Class 1 (Priority Non-Tax Claims) and Class 12 (Equity Interests) are not Impaired and are deemed to have accepted the Plan. Therefore, Plan Proponents will solicit votes only from Holders of Allowed Claims in Class Nos. 2-11 of the Plan.

3.6 <u>Vote Required for Acceptance by a Class.</u>

Under the Bankruptcy Code, a Class of Claims accepts a plan of reorganization if such plan has been accepted by creditors that hold at least two thirds in amount and more than one half in number of the Allowed Claims of such Class held by creditors that have accepted or rejected such plan. The Bankruptcy Code provides that only Holders who vote on the Plan will be counted for purposes of determining whether the requisite acceptances have been received. Failure by a Holder of an Allowed Claim in Class Nos. 2-11 to deliver a duly completed and signed ballot will constitute an abstention by such Holder with respect to a vote on the Plan. Abstentions will not be counted as votes to accept or reject the Plan and, therefore, will have no effect on the voting with respect to the Plan.

3.7 <u>Voting Procedures.</u>

Holders of Allowed Claims in Class Nos. 2-11 who elect to vote on the Plan should complete and sign the ballot in accordance with the instructions thereon, being sure to check either the "Accept the Plan" box or "Reject the Plan" box on the ballot.

IN ORDER TO BE COUNTED, COMPLETED BALLOTS MUST BE RECEIVED BY 5:00 P.M. (CENTRAL STANDARD TIME) ON **[[_____], 2026]**, AT THE FOLLOWING ADDRESS:

Carothers & Hauswirth LLP Attn:
Gregory W. Hauswirth, Esq.
Foster Plaza 10
680 Andersen Drive, Suite 230
Pittsburgh, PA 15220

3.8 <u>Confirmation Hearing.</u>

Section 1128 of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan. At that time, Plan Proponents will present the results of the vote by each Impaired Class entitled to vote in favor of or in opposition to the Plan. The Bankruptcy Court will consider whether the requirements for confirmation of the Plan under the Bankruptcy Code have been satisfied, as well as any objections to the Plan that are timely filed.

**ARTICLE IV: CONDITIONS TO OCCURRENCE OF EFFECTIVE DATE**

4.1 <u>Conditions to Effective Date.</u>

As set forth in Section 9 of the Plan, the Effective Date does not occur unless and until:

a. All of the substantive confirmation requirements under the Bankruptcy Code have been satisfied pursuant to Section 1129 of the Bankruptcy Code;

b.  No material adverse effect on the business, assets, operations, property, condition (financial or otherwise), or prospects of MonDak shall have occurred or be continuing;

c.  The Confirmation Order, in form and substance reasonably acceptable to Plan Proponents, shall have been entered by the clerk of the Bankruptcy Court, and such Confirmation Order shall have become a Final Order; and

d.  The Plan has not been withdrawn by Plan Proponents.

### 4.2     Waiver of Conditions.

Plan Proponents may waive any condition to the Effective Date, in whole or in part, at any time without notice, an order of the Bankruptcy Court, or any further action other than proceeding to confirmation and consummation of the Plan.

### 4.3     Effect of Non-Occurrence of the Effective Date.

If the Effective Date does not occur, the Plan shall be null and void and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against Debtor; (b) prejudice in any manner the rights of Debtor, including any right to seek a further extension of the exclusivity periods under Section 1121(d) of the Bankruptcy Code; (c) constitute an admission, acknowledgement, offer or undertaking by Debtor.

## ARTICLE V: FACTORS AFFECTING REORGANIZED DEBTOR'S ABILITY TO PERFORM UNDER THE PLAN

This Disclosure Statement has been prepared in conjunction with the Plan which has been developed to address the financial problems of MonDak and provide for payment of Claims (or a portion thereof) against MonDak over time.  There are a number of factors that may affect the realization of these objectives; some of those are discussed below. Prior to deciding whether to accept the Plan, each Holder of a Claim entitled to vote to accept or reject the Plan should carefully consider all risks associated with the Plan, including, but not limited to the risk factors mentioned in the following paragraphs.

### 5.1     MonDak's Historical Performance.

Attached hereto as Exhibit B is a table summarizing MonDak's historical financial performance (the "Historical Performance") of its restructured operations on a monthly basis for calendar year 2025.

---

DISCLOSURE STATEMENT FOR THE JOINT CHAPTER 11 PLAN OF REORGANIZATION
DATED APRIL 6, 2026

    5.2      <u>Ability to Make Future Payments Under Plan and Operate without Further Reorganization.</u>

Attached as <u>Exhibit C</u> to this Disclosure Statement are MonDak's financial projections for the 36 month period commencing April 1, 2026, setting forth gross income, expenses and operating income for a three-year period (the "<u>Projections</u>").  Based upon the projections, MonDak believes it can service its obligations to its creditors under the Plan.  The Projections were prepared for MonDak with its financial advisor, Ascend.  Plan Proponents submit that the Projections are reasonable and calculated assumptions that are based upon MonDak's historical financial performance, trends developed through review of available documentation and are dependent upon Reorganized Debtor's retention of the Key Employees (which retention is unique to the Plan).

    5.3      <u>Unforeseen Contingencies.</u>

Reorganized Debtor will be subject to all of the risks generally incident to a business operating in the construction industry.

    5.4      <u>Projections are not Guaranteed.</u>

Because there is no assurance that the Projections are guaranteed, it is possible that Reorganized Debtor could not have sufficient cash, or require access to additional capital, to fund ongoing operations.  In that event, Reorganized Debtor could be forced to liquidate in an orderly fashion or take other appropriate action.

## ARTICLE VI: ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

Plan Proponents believe the Plan affords Holders of Claims and Equity Interests the greatest realization on Debtor's assets, and therefore, is in the best interests of Holders of Claims and Equity Interests.  However, if the Plan is not confirmed and consummated, the theoretical alternatives to the Plan include: (a) liquidation of Debtor under Chapter 7 of the Bankruptcy Code, and (b) an alternative plan of reorganization.

    6.1      <u>Liquidation Under Chapter 7.</u>

The Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either: (a) accept the Plan; or (b) retain under the Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive or retain if MonDak were liquidated under Chapter 7 of the Bankruptcy Code on the Effective Date.  The first step in meeting this test is to determine the dollar amount that would be generated from the liquidation of Debtor's assets in the context of a Chapter 7 liquidation case.  The gross amount of cash available would be the sum of the proceeds from the liquidation of MonDak assets and the cash held by MonDak at the time of the commencement of the Chapter 7 case.  Such amount is reduced by the amount of any Allowed Claims secured by the assets liquidated, the costs and expenses of liquidation, and such additional

administrative expenses and priority claims that may result from the termination of MonDak's business operations and the use of Chapter 7 for the purposes of liquidation. Any remaining net cash would be allocated to creditors and shareholders in strict priority in accordance with Section 726 of the Bankruptcy Code.

Attached hereto as Exhibit D is a liquidation analysis for MonDak (the "Liquidation Analysis"). For the purposes of the Liquidation Analysis, MonDak has assumed that the Chapter 7 liquidation period would last six (6) months following the appointment of a Chapter 7 trustee. While some assets may be liquidated in less than six (6) months, other assets may be more difficult to collect or sell, requiring a liquidation period substantially longer than six (6) months; this time would allow for the collection of receivables, sale of assets, and the wind down of daily operations. The financials included in the Liquidation Analysis were prepared by MonDak (with the assistance of Ascend) and are included solely as may be required for the purpose of the Plan and Disclosure Statement. The insertion of these financials into the Disclosure Statement shall not be deemed as an admission against any of Plan Proponents and is not binding in any other context outside of the Plan and Disclosure Statement.

### 6.2    Alternative Plan of Reorganization

Plan Proponents believe that the Plan, as described herein, enables creditors to realize the most value under the circumstances. If the Plan is not confirmed, any party in interest could attempt to formulate a different plan. Such a plan might involve an alternative reorganization and continuation of MonDak's business or an orderly liquidation of assets of Debtor. With respect to an alternative plan, Debtor previously explored various alternatives in connection with the formulation and development of the Plan but were unable to develop a plan that was capable of being confirmed by the Bankruptcy Court. Debtor do not believe a third party, outside of Plan Proponents, could put forward a confirmable reorganization plan without the support of MonDak's key vendors and MonDak's employees, particularly the Key Employees. Katherine Zent, Barbara Rogers, and Linda Byerly are the only source of capital known to Plan Proponents, and they are the only source known to Plan Proponents who will secure the support of the Key Employees.

### ARTICLE VII: LEGAL EFFECTS OF THE PLAN

### 7.1    Vesting of Assets.

Pursuant to the Bankruptcy Code, including but not limited to Sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, on the Effective Date all assets and property of MonDak, or its bankruptcy estate shall vest in Reorganized Debtor free and clear of all Liens, Claims, causes of action, interests and encumbrances, except as provided in the Plan or the Confirmation Order.

### 7.2    Binding Effect.

Except as otherwise provided in Section 1141(a) of the Bankruptcy Code and subject to the occurrence of the Effective Date, on and after the Confirmation Date, the provisions of the Plan

shall bind any Holder of the Claims against, or Equity Interest in, Reorganized Debtor and such Holder's respective successors and assigns, whether or not the Claim or Equity Interest of such Holder is Impaired under the Plan and whether or not such Holder has accepted the Plan.

### 7.3    Discharge of Debtor.

Pursuant to Section 1141(d) of the Bankruptcy Code, and except as provided in the Plan or the Confirmation Order, confirmation will: (a) discharge MonDak, its bankruptcy estate and Reorganized Debtor from all Claims, causes of action, interests and/or other debts that arose before the Effective Date, including but not limited to all debts of the kind specified in Section 502 of the Bankruptcy Code, whether or not (i) a Proof of Claim based on such debt is filed or deemed filed pursuant to Section 501 of the Bankruptcy Code; (ii) a Claim based on such debt is Allowed pursuant to Section 502 of the Bankruptcy Code; or (iii) the Holder of the Claim based on such debt has accepted the Plan; and (b) all Persons and entities (including all Governmental Units) will be precluded from asserting against Reorganized Debtor or its assets or properties or against a successor of Reorganized Debtor or its assets and properties any other or further  Claims, causes of action, or interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.  Except as otherwise provided in the Plan or the Confirmation Order, the Confirmation Order will act as a discharge of any and all Claims, causes of action, and/or interests against, and all debts and liabilities of, Debtor, Reorganized Debtor and/or MonDak's bankruptcy estate based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date as provided in Sections 524 and 1141 of the Bankruptcy Code, and such discharge shall void any judgment against MonDak, MonDak's bankruptcy estate, and Reorganized Debtor at any time obtained to the extent that it relates to a Claim, cause of action, interest and/or debt discharged.

### 7.4    Injunctions.

**EXCEPT AS OTHERWISE PROVIDED IN THE PLAN, ON AND AFTER THE CONFIRMATION DATE, ALL PERSONS, ENTITIES AND/OR GOVERNMENTAL UNITS ARE PERMANENTLY ENJOINED FROM COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS, OR ACT TO COLLECT, OFFSET, OR RECOVER ANY DEBTS, CLAIMS, AND/OR CAUSES OF ACTION TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED BY THE BANKRUPTCY CODE, INCLUDING, WITHOUT LIMITATION, TO THE EXTENT PROVIDED FOR OR AUTHORIZED BY SECTIONS 524 AND 1141 OF THE BANKRUPTCY CODE.  EXCEPT AS OTHERWISE PROVIDED IN THE  PLAN, ALL PERSONS, ENTITIES AND/OR GOVERNMENTAL UNITS WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS, DEBTS, AND/OR CAUSES OF ACTION AGAINST IN MONDAK OR ITS BANKRUPTCY ESTATE ARE, WITH RESPECT TO ANY SUCH CLAIMS, DEBTS, AND/OR CAUSES OF ACTION, PERMANENTLY ENJOINED FROM AND AFTER THE CONFIRMATION DATE FROM: (I) COMMENCING, CONDUCTING OR CONTINUING IN ANY MANNER, DIRECTLY OR INDIRECTLY, ANY SUIT, ACTION OR OTHER PROCEEDING OF ANY**

KIND (INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING IN A JUDICIAL, ARBITRAL, ADMINISTRATIVE OR OTHER FORUM) AGAINST OR AFFECTING MONDAK, ITS BANKRUPTCY ESTATE AND/OR REORGANIZED DEBTOR OR ANY OF THEIR ASSETS AND/OR PROPERTY; (II) ENFORCING, LEVYING, ATTACHING, COLLECTING OR OTHERWISE RECOVERING BY ANY MANNER OR MEANS, OF ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST MONDAK OR ITS BANKRUPTCY ESTATE AND/OR THE  REORGANIZED DEBTOR, AND ANY OF THEIR ASSETS AND/OR PROPERTY; (III) CREATING, PERFECTING, OR OTHERWISE ENFORCING IN ANY MANNER, ANY ENCUMBRANCE OF ANY KIND AGAINST MONDAK OR ITS BANKRUPTCY ESTATE AND/OR THE REORGANIZED DEBTOR, AND ANY OF THEIR ASSETS AND/OR PROPERTY; (IV) EXERCISING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND, DIRECTLY OR INDIRECTLY, AGAINST ANY OBLIGATION DUE MONDAK OR ITS BANKRUPTCY ESTATE AND/OR REORGANIZED DEBTOR, AND ANY OF THEIR ASSETS AND/OR PROPERTY; AND (V) ACTING OR PROCEEDING IN ANY MANNER THAT DOES NOT CONFORM TO OR COMPLY WITH THE PROVISIONS OF THE PLAN. NOTHING IN THIS SECTION SHOULD BE INTERPRETED AS AN INJUNCTION AGAINST HOLDERS OF ALLOWED CLAIMS FROM ENFORCING THE TERMS AND CONDITIONS AND OBLIGATIONS UNDER THE PLAN, OR THE ENFORCEMENT OF ANY OTHER RIGHTS IN THE EVENT OF A BREACH OF MONDAK OR ITS BANKRUPTCY ESTATE, REORGANIZED DEBTOR'S AND/OR PLAN PROPONENTS' OBLIGATIONS UNDER THE PLAN, OR TO AFFECT ANY RIGHTS AND OBLIGATIONS OF REORGANIZED DEBTOR OR PLAN PROPONENTS UNDER THE PLAN.

7.5     Preservation of Rights.

All causes of action, rights of setoff, and other legal and equitable defenses of Debtor or their bankruptcy estates are preserved unless expressly released, waived, or relinquished under the Plan or the Confirmation Order, and shall vest in Reorganized Debtor upon the Effective Date of the Plan.  No Person may rely on the absence of a specific reference in the Plan to any cause of action against them as an indication that a cause of action will not be pursued against them.

**Further, unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such Claims and causes of action against third parties are specifically reserved, including but not limited to any such Claims or causes of action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignment of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, breach**

**of fiduciary duty, breach of contract, conversion, aiding and abetting, civil conspiracy, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of Collateral, wrongful retention of Collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt re-characterization, substantive consolidation, securities and antitrust  laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship including bailment, course of conduct or dealing, obligation of fair dealing, obligation of good faith, malpractice, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

       7.6    <u>Releases.</u>

As set forth in Section ____ of the Plan,  as of the Effective Date, except as provided in the Plan, or in the Order Confirming the Plan, Debtor, NAC, its officers, its counsel, and its retained professionals shall be fully and finally released and discharged of any liability or obligation from any Claim whatsoever arising during this case, with the exception of fraud, gross negligence and willful misconduct, through the Effective Date whether or not a Claim has been filed, or is deemed filed, or whether such Claim is Allowed or the Holder of such Claim has accepted the Plan. For the avoidance of doubt, the Plan does not seek to release any guaranties extended by Katherine Zent and Barbara Rogers in their individual capacity to a creditor of MonDak.

       7.7    <u>Federal Tax Consequences.</u>

The following summary of certain United States federal income tax consequences is here for informational purposes only and is not a substitute for tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim or Equity Interest.  No ruling has been sought or obtained with respect to any of the tax aspects of the Plan and no opinion of counsel has been obtained by Plan Proponents with respect thereto.  No representation or assurance is being made with respect to federal income tax consequences.  There may also be state or local tax considerations applicable to each holder of a Claim or Equity Interest which are not addressed herein.  Each Holder of a Claim or Equity Interest affected by the Plan must consult and rely upon such Holders own tax advisor regarding the specific tax consequences of the Plan with respect to such Holder's Claim or Equity Interest.

Pursuant to the Plan, Reorganized Debtor will remain in existence after the Effective Date and will make Distributions in accordance with the Plan. Holders of an Allowed Claim that receives cash in exchange for its Claim pursuant to the Plan generally will recognize a gain or loss for federal income tax purposes in an amount equal to the difference between the amount of cash received on account of the Claim, and the holder's adjusted tax basis in its Claim.  Such gain or loss is ordinarily capital in nature and is ordinarily long-term capital gain or loss if the Claim was held for more than one year.

## ARTICLE VIII: RECOMMENDATIONS AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, Plan Proponents believe that the confirmation and consummation of the Plan is preferable to all other restructuring alternatives. Therefore, Plan Proponents urge all Holders of Allowed Claims in Class Nos. 2-11 to vote to ACCEPT the Plan and to complete and return their original ballots such that they will be ACTUALLY RECEIVED at the following address on or before 5:00 p.m. (Central Standard Time) ON **[[_____], 2026]**:

Carothers & Hauswirth LLP<br>
Attn: Gregory W. Hauswirth, Esq.<br>
Foster Plaza 10<br>
680 Andersen Drive, Suite 230<br>
Pittsburgh, PA 15220

Dated: April 6, 2026

Respectfully submitted,

*/s/ Gregory W. Hauswirth*

The Dakota Bankruptcy Firm Maurice B. VerStandig, Esq.
Christianna A. Cathcart
1630 1st Avenue N Suite B PMB 24
Fargo, North Dakota 58102-4246
Phone: (701) 394-3215
mac@dakotabankruptcy.com
christianna@dakotabankruptcy.com

and

CAROTHERS & HAUSWIRTH LLP
Patrick W. Carothers (PA ID No. 85721)
Gregory W. Hauswirth (PA ID No. 307482)
Foster Plaza 10
680 Andersen Drive, Suite 230
Pittsburgh, PA  15220
Telephone:  412-414-6996
Facsimile:   412-910-7510

pcarothers@ch-legal.com
ghauswirth@ch-legal.com

*Attorneys for Debtor,*
*MonDak Portables, LLC*